# EXHIBIT C

THE STATE OF NEW HAMPSHIRE
SUPREME COURT
CASE NO. - - - -

**In the Matter of:**
**T.D. Case No. 429-2016-EA-01258**
**In the Matter of:**
**A.D. Case No. 429-2016-EA-01256**
**In the Matter of:**
**C.M. Case No. 429-2016-EA-01257**

## INTERLOCUTORY TRANSFER STATEMENT

### (A)      PARTIES AND COUNSEL OF RECORD

T.D.
Represented by Earl S. Carrel, Esq.
Backus, Meyer and Branch, LLP.
116 Lowell Street
Manchester, NH 03104
Phone: 603-244-3282
Fax: 603-668-0730

A.D.
Represented by Earl S. Carrel, Esq.
Backus, Meyer and Branch, LLP.
116 Lowell Street
Manchester, NH 03104
Phone: 603-244-3282
Fax: 603-668-0730

C.M.
Represented by Earl S. Carrel, Esq.
Backus, Meyer and Branch, LLP.
116 Lowell Street
Manchester, NH 03104
Phone: 603-244-3282
Fax: 603-668-0730

James Kegley, LICSW
Concord Hospital
250 Pleasant Street 5 West
Concord, NH 03301
Phone: 603-227-7000 ext. 4500

1
In the Matter of: T.D., Case No. 429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

John Dixon
23 Ridge Road
New Durham, NH 03855
Phone: 603-531-9297

June Tenyenhuis
Community Partners
140 York Woods Road
South Berwick, ME 03808
Phone: 603-828-1487

### INTERESTED PARTIES

Gregory J. Walker, FACHE, President & CEO
Wentworth Douglass Hospital
789 Central Avenue
Dover, NH 03820
Phone: 603-740-2163

John Marzinzik, President/CEO
Frisbie Memorial Hospital
11 Whitehall Road
Rochester, NH 03867
Phone: (603) 332-5211

Robert P. Steigmeyer, President & CEO
Concord Hospital
250 Pleasant Street
Concord, NH 03301
(603) 225-2711

Frank Nachman, Esq., Chief Legal Counsel
New Hampshire Hospital
36 Clinton Street
Concord, NH 03301
Phone: 603-271-5412

Dawn Touzin, Esq., Chief Legal Counsel
New Hampshire Department of Health and Human Services
129 Pleasant Street
Concord, NH 03301

Jeffrey A. Meyers, Commissioner
New Hampshire Department of Health and Human Services
129 Pleasant Street

2

In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

Concord, NH 03301
Phone: (603) 271-9200
Fax: (603) 271-4912

Joseph Foster, Attorney General
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301
Phone: 603-271-3658

## (B)    STATEMENT OF FACTS AND NECESSITY OF TRANSCRIPT

"Boarding, the practice in which admitted patients are held in hallways or other emergency department (ED) areas until inpatient beds become available, has often been suggested as both a cause and effect of ED overcrowding," and has gained attention as the practice has become widespread.  David Bender et al., A Literature Review: Psychiatric Boarding, U.S. DEP'T OF HEALTH & HUM. SERVS. (Oct. 29, 2008), available at http://aspe.hhs.gov/daltcp/reports/2008/psybdlr.htm (last visited Sept. 23, 2016).  For psychiatric patients, boarding occurs when no inpatient psychiatric bed is available, requiring a wait for mental health services, typically in the ED.  Id.  The crowding and lack of space often creates an environment in which a psychiatric patient slowly deteriorates.  Id.  Unfortunately, the practice is widespread.

> In 2008, 80 percent of [emergency department ("ED")] medical directors reported that their hospital "boards" psychiatric patients. Further, in 2007, 42 percent of hospitals reported an increase in boarding behavioral health patients in the ED. More than 90 percent of medical directors indicated that they board psychiatric patients every week with more than 55 percent reporting boarding daily or multiple times per week.

Id. (footnotes omitted).

The three cases here were heard on November 15, 2016 before Lauren V. Thorn, Esq., serving as Referee appointed pursuant to RSA 490-F:15. The Referee, after considering the evidence, recommended in each case that a finding of probable cause for involuntary emergency admission be made pursuant to RSA 135-C:31, I.  Judge Edwin W. Kelly read the recommendations, reviewed the facts alleged and findings made therefrom, and found that the Referee had applied the correct legal standard to the facts, and ordered the above-named Petitionees to be admitted to New Hampshire Hospital for a period not to exceed 10 days, not including Saturdays and Sundays.  In each of the above cases, the Court noted that the Petitionee, contrary to RSA 135-C:29, was not "...immediately deliver[ed] . . . to the receiving facility identified in the certificate."

### In Re: T.D.

T.D. voluntarily presented himself at the Emergency Department of Concord Hospital on October 25, 2016, and "...reported having thoughts about killing himself and

3
In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

others...." On October 28, 2016, the first Petition and Certificate for Involuntary Emergency Admission (IEA) was completed by Petitioner James Kegley LICSW. Mr. Kegley noted in his petitions that "...T.D. firmly and repeatedly requested to be discharged...." On the same date, Sonya Lee Kelly, M.D. also noted that T.D. "[d]emands to leave voluntary unit."

Subsequent to the issuance of the first Involuntary Emergency Certificate, additional Certificates were issued on 10/31/16, 11/3/16, 11/6/16 and 11/9/16. Each of those subsequent four Certificates included the notation that T.D. demanded or requested to leave the "voluntary unit." T.D. was delivered to New Hampshire Hospital on November 10, 2016. During the intervening 14 days, T.D. was held at Concord Hospital, which is not a receiving facility pursuant to RSA 135-C:29. T.D.'s hearing was held on November 15, 2016, 18 days after the first Certificate issued and 19 days after he first, "firmly and repeatedly requested to be discharged."

### In Re: A.D.

A.D. was brought to Frisbie Memorial Hospital in Rochester by local police upon Petition of his father, which recited that A.D. behaved in a threatening manner toward him and further threatened to commit suicide. The first Involuntary Emergency Certificate was issued on October 30, 2016, and noted that A.D. had previously been hospitalized in February 2016 at Franklin and then transferred to New Hampshire Hospital.

Subsequent to the issuance of the first Involuntary Emergency Certificate in this case, additional Certificates were issued on 11/2/16, 11/5/16, 11/8/16 and 11/11/16. A.D. was delivered to New Hampshire Hospital on November 12, 2016. During the intervening 14 days, A.D. was held at Frisbie Memorial Hospital, which is not a receiving facility pursuant to RSA 135-C:29. The hearing in A.D.'s case was held on November 15, 2016, 17 days after the issuance of the first Involuntary Emergency Certificate.

### In Re: C.M.

C.M. was brought to Wentworth Douglass Hospital in Dover by local police. The first Involuntary Emergency Certificate was issued in this case on October 27, 2016. The Petitioner was a mental health agency clinician. The petition recited behavior that was threatening to self and others and otherwise set forth facts that were found to meet the criteria for Involuntary Emergency Admission set forth in RSA 135-C:27.

Subsequent to the issuance of the first Involuntary Emergency Certificate, additional Certificates were issued on 11/2/16, 11/5/16 and 11/8/16. C.M. was delivered to New Hampshire Hospital on November 10, 2016. During the intervening 15 days, C.M. was held at Wentworth Douglass Hospital, which is not a receiving facility pursuant to RSA 135-C:29. The hearing in C.M.'s case was held on November 15, 2016, 20 days after the issuance of the first Involuntary Emergency Certificate.

4
In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

RSA 135-C:28 requires that, "upon completion of an involuntary emergency certificate...any law enforcement officer shall...take custody of the person to be admitted and **immediately** deliver him to the receiving facility designated in the certificate...." (Emphasis added). The Court was troubled by the delay in delivering these patients to a receiving facility. There is no construction of the word "immediately" under which a delay of 14-15 days could apply.

Accordingly, and in order to assure the safety, treatment and well-being of T.D., A.D. and C.M., the Court issued the attached Notice of Decision. Given the significant statutory and constitutional issues presented by these cases, the pressing public interest in those issues, the need to avoid the substantial likelihood of repeated litigation of the same issues—as well as the certainty, based on past history, that those issues will repeat themselves in the context of other cases and continue to evade review due to the extremely short duration of the underlying challenged actions—the Court submits this Interlocutory Transfer Statement to the New Hampshire Supreme Court setting forth the issues raised by these cases for its determination. No transcript is necessary to decide the issues raised.

### (C)    STATEMENT OF QUESTIONS

1. When is a person "admitted" to the mental health system for purposes of the involuntary emergency admission time frames set forth in RSA chapter 135-C?

2. If the person is "admitted" once the involuntary emergency admission certificate is issued pursuant to RSA 135-C:28, I, then does the practice of holding that person in emergency departments or hospitals that are not "receiving facilities" violate the statute?

3. If the person is "admitted" once the involuntary emergency admission certificate is issued pursuant to RSA 135-C:28, I, then does the practice of holding that person in an emergency department violate the person's statutory and regulatory rights to treatment?

4. If the person is "admitted" once the involuntary emergency admission certificate is issued pursuant to RSA 135-C:28, I, then does the practice of holding that person in emergency departments which are not "receiving facilities" violate the constitutional right to liberty and due process under the NH and US constitutions?

5. If a person is not considered "admitted" to the mental health system until the person is delivered to a "designated receiving facility," pursuant to RSA 135-C:29, I, how does the period of time between the issuance of the involuntary emergency admission certificate and the actual transportation and admission – sometimes a period of hours, sometimes days, sometimes over a week – factor into an analysis of the person's statutory right to treatment and constitutional rights to liberty?

5
In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

6. If the person is "admitted" once the involuntary emergency admission certificate
is issued pursuant to RSA 135-C:28, I, does the failure of the circuit court district
division (f/k/a district court) to conduct a probable cause hearing pursuant to
RSA 135-C:31, I within 3 days of the involuntary emergency "admission" divest it
of jurisdiction in the case or require another remedy?

**(D)**     **STATEMENT OF REASONS WHY A SUBSTANTIAL BASIS EXISTS
FOR A DIFFERENCE OF OPINION AND WHY INTERLOCUTORY
TRANSFER MAY MATERIALLY ADVANCE THE TERMINATION OR
CLARIFY FURTHER PROCEEDINGS OF THE LITIGATION, PROTECT A
PARTY FROM SUBSTANTIAL AND IRREPARABLE INJURY OR PRESENT
THE OPPORTUNITY TO DECIDE, MODIFY OR CLARIFY AN ISSUE OF
GENERAL IMPORTANCE IN THE ADMINISTRATION OF JUSTICE**

The legislature has set forth the policy surrounding the mental health system
within the state as codified in RSA chapter 135-C:

II. It is the policy of this state to provide to persons who are severely
mentally disabled adequate and humane care which, to the extent possible
while meeting the purposes of habilitation and treatment, is:

(a) Within each person's own community.

(b*)* Least restrictive of the person's freedom of movement and ability
to function normally in society while being appropriate to the person's
individual capacity.

(c) Directed toward eliminating the need for services and promoting
the person's independence.

RSA 135-C:1, II (emphasis added). To this end, the legislature has enumerated time
constraints governing each stage of the statutory process of an involuntary emergency
admission. Cf. State v. Fournier, 158 N.H. 441, 447-48 (2009) (noting that "[t]he
legislature specifically enumerated time constraints at each stage of the commitment
process," in concluding that time frames governing involuntary civil commitment of
sexually violent predators were jurisdictional).

The earliest time frame set forth is for evaluation of a person held in protective
custody for the purpose of determining if an involuntary emergency admission shall be
ordered, if a peace officer has transported the person for evaluation after observing the
person "engaging in behavior which gives the peace officer reasonable suspicion to
believe that the person may be suffering from a mental illness and probable cause to
believe that unless the person is placed in protective custody the person poses an
immediate danger of bodily injury to himself or others." RSA 135-C:28, III. "The period
of protective custody shall end when a physician or APRN makes a determination as to
whether involuntary emergency admission shall be ordered or at the end of 6 hours,
whichever event occurs first." Id. (emphasis added). If the petition[1] was not based upon

---

[1] "As used in RSA 135-C:27-33, 'petitioner' means any individual, including a physician or APRN
completing a certificate, who has requested that a physician or APRN conduct or who has conducted an
examination for purposes of involuntary emergency admission. Every certificate shall be accompanied by
a written petition signed by a petitioner." RSA 135-C:28, I.

In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

a peace officer's observation of the person's behavior, then a "physician or APRN . . . who is approved by either a designated receiving facility or a community mental health program approved by the commissioner," can issue a "certificate" ordering the involuntary emergency admission of a person "provided that within 3 days of the completion of the petition the physician or APRN has conducted, or has caused to be conducted, a physical examination if indicated and circumstances permit, and a mental examination," and certifies "that the person to be admitted meets the criteria of RSA 135-C:27." RSA 135-C:28, I (emphasis added). Among other requirements of the certificate, "The physician or APRN shall identify in the certificate the facility in the state mental health services system to which the person shall be admitted," based upon "the facility which can best provide the degree of security and treatment required by the person and shall be consistent with the placement principles set forth in RSA 135-C:15." Id.

"Upon completion of an involuntary emergency admission certificate under RSA 135-C:28, any law enforcement officer shall, except as provided in paragraph II [addressing the transportation of children subject to involuntary emergency admission], take custody of the person to be admitted and immediately deliver him to the receiving facility identified in the certificate." RSA 135-C:29, I (emphasis added). "At the receiving facility, any person sought to be involuntarily admitted for involuntary emergency admission shall be given immediate notice . . . in simple language he may understand, and written notice within 12 hours, of" his right "[t]o be represented by legal counsel," "[t]o have legal counsel appointed for him if he is indigent," "[t]o apply for admission on a voluntary basis," "[t]o consult with legal counsel prior to a change in admission status," "[t]hat involuntary emergency admission cannot exceed a period of 10 days, not including Saturdays and Sundays, unless the period is extended pursuant to RSA 135-C:32," and "[t]hat no treatment shall be administered during involuntary emergency admission unless he makes an informed decision . . . to consent to treatment, or unless a medical or psychiatric emergency exists in accordance with RSA 135:21-b." RSA 135-C:30 (emphases added).

Next, "[w]ithin 3 days after an involuntary emergency admission, not including Sundays and holidays, . . . there shall be a probable cause hearing in the district court having jurisdiction to determine if there was probable cause for involuntary emergency admission." RSA 135-C:31, I. "The court shall render its written decision as soon as possible after the close of the hearing, but not later than the end of the court's next regular business day." Id. And ultimately, the involuntary emergency admission can last no longer than 10 days, absent a subsequent involuntary emergency admission or a non-emergency involuntary admission petition filed in probate court. RSA 135-C:32.

RSA 135-C:31 thus mandates by use of the term "shall" that the district court hold a probable cause hearing within 3 days after an involuntary emergency admission. Determination of the exact time at which the involuntary emergency admission occurs is therefore necessary to the question of when the probable cause hearing must take place. The 3-day time limit is modified by the exception that Sundays and holidays are excluded. In addition, the 3-day limit is "subject to the notice requirements of RSA 135-

In the Matter of: T.D., Case No. 429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

C:24," id., which, in turn, provides that "[b]efore any judicial hearing commences, the client or the person sought to be admitted shall be given written and oral notice, in a language he understands, of his right to be represented by legal counsel and to have legal counsel appointed for him if he is indigent." RSA 135-C:24.

Neither legislative history nor current practice renders clear when the 3-day limitation commences.

The court is rarely, if ever, aware that a person is the subject of an involuntary emergency admission until a petition is filed with the court (the Circuit Court District Division). Petitions are generally filed via the "receiving facility" and are scheduled for a hearing to occur within RSA 135-C:31's three-day time mandate following that filing. Thus, based upon current practice, the mental health community appears to consider the transfer to the receiving facility as the triggering event. In other words, it appears that the transfer to the receiving facility is being treated as constituting "admission" to the mental health system. However, under this interpretation, persons could remain at an emergency room for an extended period without court intervention. Indeed, a court review of 1251 IEA cases filed during 2015 found that in 43% of those cases, the person was not transferred immediately to a receiving facility. In some cases, as in the instant cases, at the expiration of the RSA 135-C:28 three-day period (between filing of the petition and the doctor or APRN's certificate), when the person has not been transferred to a receiving facility, another petition and certificate was filed at the emergency room or hospital. In the cases before the court, up to four additional petitions and certificates were filed before the transfer to the receiving facility was accomplished, resulting in stays in the emergency room up to 15 days long. In such cases, the court was not aware that the person was the subject of a petition until the individual was eventually transferred to the receiving facility and the petition was filed.

Persons subject to an involuntary emergency admission are often transferred to the "receiving facilities" from other medical facilities such as hospital emergency rooms, following the examination by a physician and issuance of an involuntary emergency admission certificate (pursuant to RSA 135-C:28, I). However, there are several statutory provisions allowing restrictions of the liberty of a person before the person is transferred to a "receiving facility." Within the involuntary emergency admission process, "any law enforcement officer shall take custody of persons who are subject to proceedings for involuntary emergency admission . . . in the following circumstances:
    (a) Upon completion of an involuntary emergency admission certificate in accordance with RSA 135-C:28, I;
    (b) Upon issuance by a justice of the peace of an order for a compulsory mental examination pursuant to RSA 135-C:28, II;
    (c) Upon a finding of probable cause at an involuntary emergency admission hearing held pursuant to RSA 135-C:31;
    . . . [or]
    (g) As necessary to ensure the presence of the person at hearings or examinations conducted under this chapter, to effect a transfer between receiving facilities, or to carry out any other lawful order of a court.

8

In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

> II. A law enforcement officer shall also transport any persons taken into
> custody to the appropriate receiving facility, court, place of examination,
> or other location."

RSA 135-C:62 (emphasis added). Specifically, RSA 135-C:62, I(b), referring to the
certification procedure in RSA 135-C:28, II, could lead to potentially lengthy pre-
certification detention. RSA 135-C:28, II provides:

> Upon request for involuntary emergency admission by a petitioner, if the
> person sought to be admitted refuses to consent to a mental examination,
> a petitioner or a law enforcement officer may sign a complaint which shall
> be sworn to before a justice of the peace. The complaint shall be submitted
> to the justice of the peace with the petition. The petition shall state in
> detail the acts or actions of the person sought to be admitted which the
> petitioner has personally observed or which have been personally reported
> to the petitioner and in his or her opinion require a compulsory mental
> examination. If the justice of the peace finds that a compulsory mental
> examination is necessary, the justice may order the examination.

The court's review has not disclosed a statute or regulation indicating a time period by
which the mental examination must be completed, other than the three-day period
between petition and certificate set forth in RSA 135-C:28, I. As described above,
practice has not always indicated that this three-day window has been observed. And
the court is seldom aware of a person detained, including potentially by law
enforcement, at this point in the involuntary emergency admission process.

Compounding the confusion over when a person has been "admitted" to the
mental health system is the fact that "[a] receiving facility may be designated by the
commissioner for one or more of the following purposes:

> (a) To receive clients under RSA 135-C:27-33 beginning with initial
> custody and continuing through the day following the probable cause
> hearing.
> (b) To receive clients under RSA 135-C:27-33 for the period of involuntary
> emergency admission after the probable cause hearing.
> (c) To receive clients for involuntary admission under RSA 135-C:34-54."

RSA 135-C:26, II. The statute thus appears to contemplate a phase of "initial custody"
through the determination of probable cause, and the facility housing a person in this
phase of the involuntary emergency admission process may or may not be the same as
the facility to which the person would be transported following a determination of
probable cause. As it turns out, the "designated" status of a facility holding a person in
that phase of the involuntary emergency admission process carries significant weight in
terms of the statutory rights afforded such a person: "The rights established in RSA 135-
C:56-60 shall only apply to those persons who have been found eligible for services
under RSA 135-C:13 and to those persons who have been <u>admitted</u> to receiving
facilities." RSA 135-C:55 (emphasis added). Those statutory rights include
"[f]undamental rights," including the retention of constitutional rights, the right not to
be "discriminated against on the basis of race, color, sex, religion, national origin, age,
disability, or degree of disability," an admonition that "[n]o person receiving mental
health services shall be subjected to abuse or neglect," and the policy that "[p]ersons

9
In the Matter of: T.D., Case No. 429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

receiving mental health services shall be treated with dignity and respect." RSA 135-C:56. The statute also provides that

> Persons receiving mental health services shall have the right to:
>
> I. An individual service plan developed in accordance with 135-C:19.
>
> II. Be informed of and to give consent before administration of any treatment. All elements of an informed decision as defined in RSA 135-C:2, IX shall be present.
>
> III. Refuse all forms of medication, treatment, or services, except emergency treatment under the terms and conditions prescribed by law or by rules adopted by the commissioner under RSA 541-A.
>
> IV. Treatment in the least restrictive environment necessary to achieve the purposes of the treatment.
>
> V. Freedom from seclusion or physical or pharmacological restraint. Seclusion or restraint shall be administered only with the consent of the person, who has made an informed decision, or as a form of emergency treatment imposed by law or by rules, adopted by the commissioner under RSA 541-A.

RSA 135-C:57. Additional rights to communication, and to be safeguarded by a guardianship in certain circumstances, are also explicitly provided within the chapter. See RSA 135-C: 58 ("Communication Rights for Persons in Receiving Facilities"); 135-C:60 (Guardianship). "Each client has a right to adequate and humane treatment provided in accordance with generally accepted clinical and professional standards," which "treatment shall include such psychological, psychiatric, habilitative, rehabilitative, vocational and case management services which are necessary and appropriate to bring about an improvement, when possible, in the client's condition and which are available within the state mental health services system." RSA 135-C:13.

> All persons receiving mental health services shall be informed of the rights guaranteed by this chapter, and by the rules it authorizes to be adopted under RSA 541-A by the commissioner, promptly upon admission or upon determination of eligibility for services. All receiving facilities, community mental health programs, and community residences shall post a notice and an explanation of these rights.

RSA 135-C:59.

At least one state supreme court has found that the practice of "psychiatric boarding" is unlawful "as a method to avoid overcrowding certified evaluation and treatment facilities," explaining, "Patients may not be warehoused without treatment because of lack of funds." Det. of D.W. v. Dep't of Soc. and Health Servs., 332 P.3d 423, 428, 426 (Wash. 2014). The State's lawful power to hold those not charged or convicted of a crime is limited. See id. at 426. However, "[t]he State's parens patriae and 'police power' interests in ensuring that 'dangerous' mentally ill persons not harm themselves or others is beyond dispute." McCabe v. Life-Line Ambulance Service, Inc., 77 F.3d 540, 547 (1st Cir. 1996). "The Fourth Amendment applies not only to governmental searches and seizures in criminal investigations, but also in various civil proceedings," including "involuntary commitment proceedings for dangerous persons suffering from mental illness." Id. at 544. A federal court for the District of New Hampshire has noted that

10

In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257

"[t]he Fourth Amendment governs the period of confinement between warrantless arrest and initial judicial proceeding or court hearing to determine probable cause," and found that a five-hour detention during which the person was handcuffed "constitute[d] a seizure of his person which, in this case, was apparently made without a judicial determination of probable cause." Weber v. New Hampshire, No. 09–cv–449–PB, 2010 WL 148368 (D. N.H. 2010). Because the five-hour detention was less than the six hours permitted under the presumptively constitutional (and not challenged) time limit in RSA 135-C:28, III, the court found that the detention was not unreasonable for Fourth Amendment purposes. Id.

During the period leading up to the probable cause hearing, the liberty interest of the person sought to be admitted is impacted. The person remains in custody at the receiving facility or, if not transferred to the receiving facility, at the emergency room or hospital awaiting transfer once the certificate is issued. As noted above, in some cases, such as those at issue here, the person may remain at the emergency room for weeks, during which petitions continued to be filed once the initial three day time mandate has ended. It is only when the person is transferred to the receiving facility that a petition is filed with the court. Because the liberty interest of the individual sought to be admitted is impacted, potentially for many days, the time limitation contained in RSA 135-C:31, I is arguably jurisdictional. Based upon foregoing, the time mandate contained in RSA 1, I may be considered to be "jurisdictional" such that the Circuit Court District Division (f/k/a district court) loses jurisdiction over the proceeding if the three-day time mandate is not met.

Although these particular persons are unlikely to remain detained throughout the hearing of this appeal because their initial involuntary emergency admission only lasts for ten days, this case presents issues of significant statutory and constitutional dimensions. "[T]he pressing public interest in those issues and the avoidance of future litigation of the same issues justify a decision on the merits." Royer v. State Dept. of Employment Sec., 118 N.H. 673, 675 (1978) "Additionally, this case presents issues that are 'capable of repetition, yet evading review.'" Id. "The challenged action was too short in duration to be fully litigated prior to its expiration," and, without guidance on when a person is considered to be "admitted" to the mental health system, subject to its protections and time frames, there is a reasonable expectation that the challenged conduct of psychiatric boarding will continue. See id.

**(E) SIGNATURE OF THE TRIAL COURT TRANSFERRING THE QUESTION**

11/17/16
Date

Hon. Edwin W. Kelly, Administrative Judge

11
In the Matter of: T.D., Case No.  429-2016-EA-01258
In the Matter of: A.D., Case No. 429-2016-EA-01256
In the Matter of: C.M., Case No. 429-2016-EA-01257