**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/19/21

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3   * * * * * * * * * * * * * * * * *
                                    *
4   JOHN DOE, ET AL.,               *
                                    *
5                    Plaintiffs.    *  No. 1:18-cv-1039-JD
                                    *  April 2, 2020
6          v.                       *  10:00 a.m.
                                    *
7                                   *
    COMMISSIONER, NEW HAMPSHIRE     *
8   DEPARTMENT OF HEALTH AND HUMAN  *
    SERVICES, ET AL.,               *
9                                   *
                     Defendants.    *
10  * * * * * * * * * * * * * * * * *

11                  TRANSCRIPT OF MOTION HEARING
12                       VIA VIDEOCONFERENCE
            BEFORE THE HONORABLE JOSEPH A. DiCLERICO, JR.
13
    APPEARANCES:
14
    For the Plaintiffs:        Aaron J. Curtis, Esq.
15                             Colin McGrath, Esq.
                               Weil Gotshal & Manges
16
    For the Intervenor
17  Plaintiffs:                Michael D. Ramsdell, Esq.
                               Sheehan Phinney Bass & Green
18

19  For the Defendants:        Samuel R.V. Garland, Esq.
                               NH Attorney General's Office
20                             Civil Bureau

21

22
    Court Reporter:            Brenda K. Hancock, RMR, CRR
23                             Official Court Reporter
                               United States District Court
24                             55 Pleasant Street
                               Concord, NH 03301
25                             (603) 225-1454

1              P  R  O  C  E  E  D  I  N  G  S

2          THE CLERK:  The Court has before it for consideration

3     today via video a motion hearing in Civil Case 18-cv-01039-JD,

4     Doe versus New Hampshire Department of Health and Human

5     Services, et al.

6          THE COURT:  Good morning to everybody.  As you're all

7     well aware, we are facing difficult challenges due to the

8     coronavirus.  The Court is making every effort consist with

9     health, safety and governmental directives to keep the business

10    of the court moving forward to the extent practicable.  The

11    Court is also aware of the important principles of public

12    access to court hearings and has tried to accommodate that for

13    today's hearing.  So, public access has been granted to a

14    number of those who have requested it.

15         I would like to remind those who have been granted

16    public access to this hearing of Local Rule 83.8, which I

17    understand has been provided to you by the Deputy Clerk, but I

18    will read it.  It provides that all persons participating in

19    court proceedings remotely, by video conference or

20    teleconference, shall not photograph, broadcast or televise any

21    of these court proceedings.  This prohibition applies to

22    counsel, parties, the media and any member of the public.  By

23    "photograph," that means still or video photograph.  The Court

24    expects you to comply with this rule, and I have every

25    confidence that you will.

1          I would like to remind all of us as participants that

2     we should make an effort not to talk over each other.

3     Sometimes there is a delay with the sound, so we should all try

4     to be mindful of waiting until the speaker has finished before

5     asking a question or making a remark.  This will also make it

6     easier for our court reporter, who is taking a record of this

7     hearing.

8          Now, the Commissioner has filed the pending Motions to

9     Dismiss, so we will start with Mr. Garland, who is counsel for

10    the Commissioner, and what I would like Mr. Garland to do is to

11    focus at the outset as to how the Commissioner is interpreting

12    and applying the Involuntary Admissions statute and the

13    reasoning and justification for that interpretation, since that

14    is one of the major issues in this case.  Mr. Garland.

15         MR. GARLAND:  Thank you, your Honor.  And I told

16    Kellie earlier on, and I just want you to know, and you may

17    well already, Dan Will is with me.  He is not appearing by

18    video, but he's filed an appearance in the case, and we are

19    socially distancing right now.

20         So, with respect to the statutory construction of

21    RSA 135-C, it appears that there are three arguments that the

22    plaintiffs and intervenors are making as to how there is state

23    action under that statute, and I believe my response to those

24    arguments will set forth how we are constructing that statute

25    and why we believe that not to be the case, but I obviously

1   welcome any questions that you might have as I go through that.

2         There is a suggestion that RSA 135-C obligates

3   hospitals to seek involuntary emergency admissions or to

4   participate in that process in the first place.  We do not

5   believe that the statutory language as structured supports

6   that.  The petition is filed by any individual.  That's RSA

7   135-C:28,I and Judge McAuliffe in Trimble noted that "any

8   individual" encompasses many private actors.  Medical

9   professionals at private facilities are the ones who complete

10  the certificates, and so that's the process that happens after

11  a petition is filed.  They are also private actors under the

12  statute.

13        There's a suggestion, I believe, in the hospital

14  surreply that, because designated receiving facilities approve

15  the individuals, the medical professionals who complete the

16  certificates, that somehow creates state action, and we don't

17  believe it does.  We believe that Judge McAuliffe correctly

18  rejected that in Trimble, and we would liken it to a licensing

19  or permitting regime that requires certain professionals in

20  many different walks of life to be approved by the State, but

21  that doesn't confer upon them state action.

22        THE COURT:  Excuse me a minute.  Let's begin at the

23  beginning.  Am I correct that the Department's website directs

24  people to hospital emergency rooms because there are no walk-in

25  emergency or crisis services available at the New Hampshire

1      Hospital, so they are -- people are directed to the emergency

2      rooms.  Is that correct?

3            MR. GARLAND:  That is correct, your Honor.  We don't

4      dispute that characterization.

5            THE COURT:  And they're also told, as I understand it

6      now, that they may have to wait --

7            MR. GARLAND:  I believe that's correct as well.

8            THE COURT:  -- if they're admitted.  They may end up

9      having to wait there.  So, you've got the Department

10     instructing people to go to the emergency department.  Now, I

11     think you just said that emergency departments don't have to

12     handle these cases.

13           MR. GARLAND:  So, I don't think they have to handle

14     them through the involuntary commitment process, your Honor.  I

15     do think there may be other obligations, EMTALA, common-law

16     duties, other obligations that requires that an emergency

17     department stabilize, maybe even treat, and there may be

18     prudential concerns that a hospital would have that it would

19     not just reject a patient.  But the decision to invoke the

20     emergency -- or the commitment process in general -- but the

21     emergency involuntary admission process we believe is a

22     voluntary one.  We believe that's reflected in the statute.

23     And so, there are other options that a hospital could have.

24           THE COURT:  Well, whether a person has a severed

25     artery and appears in an emergency room, or whether that person

1   is having a serious mental crisis, those are emergencies,

2   whether it's physical or mental, that have to be addressed, and

3   isn't the hospital under an obligation by State statute to

4   address that emergency?

5          MR. GARLAND:  Your Honor, are you specifically

6   referring to Chapter 135-C or another State statute?

7          THE COURT:  I'm referring to, well, first of all,

8   151:2-g, which says that every facility licensed as a hospital

9   shall operate an emergency department.  So, the hospital is

10  obligated to have an emergency department offering emergency

11  services to all individuals.

12         MR. GARLAND:  Okay.  Yes.

13         THE COURT:  So, the hospital is obligated by law to

14  accept these patients and to address their needs, is it not?

15         MR. GARLAND:  I believe that's correct, your Honor.

16  But where I would draw a distinction is I don't believe that

17  they are obligated by law or by virtue of Chapter 135-C to

18  invoke the involuntary commitment process.  There may be

19  reasons why they would choose to do that, and we don't dispute

20  that, and there may be very legitimate reasons, but it's not a

21  requirement.  I mean, a hospital could always choose to treat a

22  patient as opposed to trying to have them committed to the

23  State mental health system.

24         THE COURT:  If a patient meets the requirement for

25  involuntary emergency admission under the statute, then isn't

1  the hospital obligated to follow that procedure and issue a

2  certificate?  On page 11 of the Commissioner's brief there's

3  this sentence that if a private hospital does not want to hold

4  a patient it does not need to complete an IEA petition or

5  certificate in the first instance.  Is that really the position

6  that the Commissioner is taking here?

7        MR. GARLAND:  Your Honor, I believe -- I would make

8  two points to the first question, but I do believe that, yes,

9  the position is that it's not obligated under the law.  There

10 may be specific reasons why a hospital would choose to do that,

11 and we don't dispute that.  But with respect to the process as

12 set forth in 135-C being mandatory, we don't believe that the

13 language of the statute requires that or supports that

14 conclusion.  And I would -- and, forgive me; I'm looking at a

15 notebook here.

16       THE COURT:  Sure.

17       MR. GARLAND:  135-C:27 and also 135-C:28,I.  In

18 135-C:27 it says that a person shall be eligible for

19 involuntary emergency admission if the conditions, the mental

20 conditions that are set forth there are present.  It says shall

21 be eligible, but it doesn't say they shall be admitted, so we

22 do think that that means that it is not mandatory.  But I think

23 more telling is in RSA 135-C:28,I, which contemplates that,

24 once a petition has been filed it does require that the

25 physician, the physician's assistant or the APRN conduct an

1    examination, but I don't think it requires, your Honor, that a

2    certificate be completed.  It states -- and forgive me as I'm

3    going through this -- I may actually be missing the point I was

4    trying to make with respect to that.  But I think the larger

5    point is it does say the admission may be ordered upon a

6    certificate, and the only specific thing that the statute

7    requires is that, when the petition is filed that the

8    physician's assistant, the physician, the APRN conduct an

9    examination.  I don't read that statute to require that a

10   certificate then be completed, and I don't think the statutory

11   language supports a requirement that someone then be admitted

12   if a certificate is completed.  I think the admission may be

13   ordered is discretionary, not mandatory.

14          THE COURT:  So, if the person, if the presenting

15   patient meets all the criteria for admission you're saying the

16   hospital can say, Well, we're not going to do it?

17          MR. GARLAND:  Right.  Yes, your Honor.  I believe the

18   decision what to do under those circumstances would be up to

19   the professional judgment of the medical provider, and it could

20   be that the hospital chooses to treat the patient as opposed to

21   seek to admit them.  I mean, there are hospitals --

22          THE COURT:  That's right.  All right.  So, let's get

23   past that first issue, and referring back to Section I of 28

24   that you just referred to, we now have a patient who has met

25   the requirements, and the medical judgment is that this patient

1    must be admitted under the involuntary procedure, and the very

2    first sentence there says, "The admission is to the state

3    mental health services system."  So, when that certificate

4    issues isn't it to the system that this person is admitted at

5    that point in time?

6              MR. GARLAND:  Your Honor, we do not believe that the

7    person is admitted to the system at that point in time.  We

8    believe that the admission occurs once they are admitted to a

9    designated receiving facility or a New Hampshire Hospital, and

10   the reason for that -- there are a few different reasons for

11   that.  The first is that -- and I know this is a highly

12   disputed part of this case -- but we do not believe the statute

13   supports the conclusion that a private hospital that is not a

14   designated receiving facility or a portion of a hospital that

15   is not a designated receiving facility is part of the State

16   mental health system under the supervision of the Commissioner.

17   And the reason for that is --

18             THE COURT:  But the person -- it's the patient who has

19   been admitted to the system, so the system is now responsible

20   for that patient.

21             MR. GARLAND:  Your Honor, I believe our reading of it

22   is that the patient is admitted to the system when they are

23   actually physically admitted to a designated receiving facility

24   or a New Hampshire Hospital, not by virtue -- not by operation

25   of a certificate being completed.

1          THE COURT:  Well, if you look at Section 1 again,

2     there are really two types of admission.  You've got admission

3     to the system, and then later on in the paragraph the admission

4     is made to the facility.  So, you've got two types of

5     admission.  First, you come into the system and then you're

6     admitted to a facility.  But anyway.

7          Now, one thing I wanted to ask you is in the

8     Commissioner's memo you've referred to I believe it's Section

9     20, 29 or 39.  39.  In the Commissioner's memorandum you've

10     taken the position that Section 29 applies to someone who's

11     been admitted and that they're at liberty pending the hearing.

12     Now, Section 39 of 135 is part of the nonemergency involuntary

13     admission procedure.  That really has nothing to do with the

14     emergency procedure.  Do you agree with that?  Do you agree

15     that you've misread that?

16          MR. GARLAND:  No, your Honor.

17          THE COURT:  How am I misreading it?

18          MR. GARLAND:  Okay.  So, the analysis that we've

19     conducted with respect to colon 39 is that it's making specific

20     reference -- a label of where something fits within a statute

21     is not dispositive as to its operation, and it states the

22     person sought to be admitted for treatment on an involuntary

23     basis, which we would argue assumes emergency admissions as

24     well, and then in (I)(a) it makes specific reference to the

25     involuntary emergency admission process and protective custody

1    under that process.  But I would reiterate or maybe point to --

2    I don't know if "reiterate" is the right word -- that I don't

3    think our argument with respect to when a person is admitted to

4    the state mental health system rises and falls by operation of

5    that statute.  I believe that there are several other aspects

6    of 135-C that support our conclusion.

7            THE COURT:  Okay, I understand that.  But just to

8    finish up with this one item --

9            MR. GARLAND:  Mm-hmm.

10           THE COURT:  -- if your interpretation is correct, that

11   means that somebody who is found to be a danger to him or

12   herself or others is at liberty to go.  That simply doesn't

13   make any sense.

14           MR. GARLAND:  The distinction I draw, your Honor, is I

15   think there are two or multiple versions of "liberty" or

16   multiple meanings of "liberty" that we may be using.  Our

17   argument is that they are at liberty from state custody.  They

18   may not be at liberty from custody of a private hospital for

19   other reasons, but the operation of the statute is that they

20   are at liberty from state custody.

21           But, again, I don't think that our reliance on that

22   provision is dispositive of our argument that private hospitals

23   are not part of the state mental health system.  The phrase

24   "person to be admitted" is frequently used throughout this

25   code.  We've cited a few different instances, there are

1   probably about a dozen, and that almost uniformly, if not

2   uniformly, appears to be referring to admitted to a designated

3   receiving facility.  RSA 135-C:28,I states that it would be

4   admitted to the -- excuse me -- the state mental health

5   services system under the supervision of the Commissioner.  As

6   your Honor just pointed out, RSA 135-C:3 requires that the

7   Department establish, maintain, implement and coordinate a

8   system of state mental health services which shall be

9   supervised by the Commissioner.  And then moving down the

10  statutory code and, in particular 135-C:26, the Commissioner

11  does that or DHHS does that by establishing these receiving

12  facilities, and they are then within the supervision of the

13  Commissioner.  And it's not something that he can wave a magic

14  wand and declare.  It's something that he has to get express

15  consent from the administrator of the private facility to do.

16          And so, I believe that when you read those together,

17  the plain language and the structure of those provisions

18  contemplate that the state mental health services system within

19  the supervision of the Commissioner is not any private hospital

20  following the point of the completion of the certificate, but,

21  rather, the specific facilities that have been designated as

22  part of that system and by operation of 135-C:26 are within the

23  Commissioner's supervision.

24          THE COURT:  So, does the patient's location really

25  matter as to whether the patient is in the system or not under

1    this statute?

2            MR. GARLAND:  In terms of location -- in terms of what

3    sort of facility they're at, your Honor?

4            THE COURT:  Once the certificate is issued.

5            MR. GARLAND:  We believe it does, your Honor.

6            THE COURT:  Does the fact that the person happens to

7    be in an emergency room as opposed to a designated facility

8    mean that person isn't in the system yet?  You say yes.

9            MR. GARLAND:  Yes, your Honor.  And, again, the

10   provisions that -- the language and structure that I just

11   pointed out I think support that.  I mean, it does contemplate

12   that a person is a person to be admitted, and that's in

13   135-C:29, even when the law enforcement officer takes that

14   person into custody for transportation to a designated

15   receiving facility.  That future tense suggests that they are

16   not admitted yet.  And the fact that private hospitals are not

17   within the supervision of the Commissioner as the statutory

18   structure lays out for approving designated receiving

19   facilities we think further supports that.

20           THE COURT:  Has the State been directing hospitals to

21   complete successive IEA certificates every three days?

22           MR. GARLAND:  My understanding, your Honor, of what

23   that's referring to is the State has represented to hospitals

24   that, if they're going to detain people in emergency rooms and

25   still intend to transport them, then it is best practice to

1     complete them, because you don't want to have stale findings of

2     medical conditions.  And so, it's not a you must detain them on

3     a certificate.  It's that if the desire is still as opposed to

4     treating a person within the private hospital or seeking one of

5     the alternative forms of treatment under 135-C:29(a), if the

6     intent is still to transfer that person to a designated

7     receiving facility, then the certificate needs to be up to

8     date, it can't be stale.  And so, I believe that's where that

9     comes from.

10          THE COURT:  You don't think that the fact that IEAs

11    are being used excessively is indicative of the fact that the

12    Commissioner acknowledges patients are being held in her

13    custody?

14          MR. GARLAND:  I don't think it means that the

15    Commissioner is acknowledging that people -- patients are being

16    held in their custody, because I believe the statutory

17    structure, which I discussed earlier, supports the conclusion

18    that you're not within state custody or at least not admitted

19    to the state mental health services system until you are

20    transferred to a designated receiving facility.  I will not

21    dispute, though, your Honor, that the Commissioner is aware

22    that people are being held in private emergency rooms, and

23    that's something that, as the ACLU alleges in its complaint,

24    and I think is fairly common knowledge, this is something that

25    many stakeholders, including the State, have tried to find a

1    solution to, and the State is continuing to try to find a

2    solution to that, along with the same stakeholders.  But that

3    does not mean, we believe, particularly given that we believe

4    the statutory language requires the contrary conclusion, that a

5    person is within state custody when they remain within a

6    private emergency room.

7           THE COURT:  You would agree, though, that if the

8    statute is interpreted so that a patient is considered to be in

9    the mental health services system once the IEA certificate has

10   issued, then a hearing, probable cause hearing would have to be

11   held within three days?

12          MR. GARLAND:  Yes.  If they're admitted to the state

13   mental health services system, your Honor, we do agree with

14   that.  Our dispute, and I think you've hit on the crux of it,

15   is that we don't believe -- and we believe, rather, that the

16   statute rather unambiguously dictates that a person is not

17   within that system until they're admitted to a DRF.  But if you

18   were to interpret it in a contrary manner, or if you were to

19   certify questions and the New Hampshire Supreme Court were to

20   interpret it in a contrary manner, we do agree that a due

21   process hearing would then be required.

22          THE COURT:  The way the system is operating now, once

23   the person is assigned and admitted to a designated facility

24   there is a probable cause hearing within three days of

25   admission?

1     MR. GARLAND:  Yes, your Honor.  I don't think anybody

2  -- I won't speak for the plaintiffs or the hospitals, but, yes,

3  that's our understanding.  And I don't think they're alleging

4  otherwise.

5     THE COURT:  And what are the mechanics of setting up

6  that probable cause hearing?  Who notifies the court?  Whose

7  responsibility is it to notify the court that this hearing must

8  be scheduled?

9     MR. GARLAND:  Your Honor, that's something that I

10  don't know off the top of my head, and maybe one of the other

11  counsel will know.  But I'm not sure specifically.  I do know

12  that the Court isn't notified until I believe a person is at a

13  designated receiving facility.  I suspect it's a designated

14  receiving facility, but I'm not certain of that, so I don't

15  want to make a misrepresentation.

16     THE COURT:  I notice that the involuntary admission

17  certificate that was provided as Exhibit A to one of the

18  filings, the very first page the title is the State of New

19  Hampshire Judicial Branch.

20     MR. GARLAND:  Excuse me, your Honor.  I'm pulling it

21  up.  Yes, your Honor.

22     THE COURT:  All right.  You're familiar, of course,

23  with Judge McNamara's decision from the Merrimack County

24  Superior Court?

25     MR. GARLAND:  I am, your Honor, and I think we put

1     this into our briefing, but if we did not our position with

2     respect to that is the State wasn't a party, state action

3     wasn't raised in that case, and we do think that his conclusion

4     that a person is admitted upon completion of the certificate is

5     incorrect for the reasons that we've set forth and the reasons

6     I've said today.

7             THE COURT:  All right.  Go ahead.  I've been

8     interrupting you.

9             MR. GARLAND:  That's okay.  You've followed my -- the

10    procession of my notes remarkably well, so I appreciate that.

11            Another point that I would like to make about the

12    timing of everything, because I do think that is another issue

13    that's central to the case, is that both the plaintiffs and the

14    hospitals argue that a person must be, upon completion of a

15    certificate, immediately taken into custody and then

16    transported, and I don't believe that RSA 135-C:29 supports

17    that reading.  The adverb "immediately" in that sentence

18    appears to -- it doesn't appear to -- it does modify the act of

19    transporting somebody once they're in custody.  There's no

20    similar modifier for the act of taking somebody into custody

21    within C:29 or within any other provision that I've been able

22    to find.  The legislature knew how to and has demonstrated

23    throughout this particular chapter that it knew when it wanted

24    to emphasize that something had to be done within a specific

25    time frame or as expeditiously as possible that that happen.

1    It requires due process hearings within three days of

2    admission.  We say admission to a designated receiving

3    facility.  It says transport immediately once taken into

4    custody.  There are time frames that are set out for protective

5    custody that don't really apply in this case, but when a person

6    is in state custody when certain things must happen, and that's

7    down to the hour.  And the legislature did not use a similar

8    modifier with respect to the act of taking someone into custody

9    upon completion of a certificate and then transporting that

10   person to a designated receiving facility.  And furthermore,

11   the legislature, we believe, was aware that a period of time

12   and expressly contemplated that a period of time could exist

13   between those two acts, the completion of the certificate and

14   the act of taking someone into custody.  C:29(a),I and II both

15   suggest that a certificate can be rescinded if certain

16   conditions are met and shall be rescinded if a patient no

17   longer meets the criteria of C:27.  And the specific ways that

18   something can be rescinded contemplates a period of time

19   developing where a person either is no longer showing symptoms

20   or a person can be transferred to somewhere else in the

21   community.

22          In addition to that, RSA 135-C:13 makes clear that

23   admissions to the state mental health services system and

24   access to treatments or other services within the system is

25   contingent upon availability of appropriations.  I mean, they

1    specifically said that in there.  And so, it appears the

2    legislature did contemplate that you may be eligible, as the

3    statute uses it in C:27, for an admission to a state facility

4    or a designated receiving facility, but you may not be able to

5    get there.  It is as appropriations allow.

6           And I would note, your Honor, that neither the

7    plaintiffs nor the hospitals are challenging the

8    constitutionality of the statute itself.  They are reading the

9    statute in way that is contrary to how we read it and saying it

10   imposes obligations on the Commissioner that the Commissioner

11   is not complying with that both violate the federal and state

12   Constitution and then also violate the plain language of the

13   statute.  They're not saying the statutory structure itself is

14   unconstitutional.  I think that would be a fundamentally

15   different case, and it's not the case you're presented with.

16          And so, we believe that these time frames that are set

17   forth where this legislature is specifically contemplating

18   periods of time passing is recognizing that appropriations may

19   not be sufficient to accommodate all people in the mental

20   health system supports our reading that the legislature chose

21   not to put a specific time frame on the transport of someone to

22   a designated receiving facility.

23          THE COURT:  If you interpret the statute as admitting

24   a patient to the system when the certificate is issued, then

25   you don't need a strained interpretation of transporting the

1    person to a designated facility.  You're sort of straining the

2    interpretation of that to fit what's going on now.

3         MR. GARLAND:  I would quibble, your Honor, with

4    "straining the interpretation."  Obviously, we think that we're

5    interpreting the language and the structure as it's set forth.

6    And I would just again reiterate that our reading of the

7    statute and as it works kind of as a cohesive whole is that a

8    state mental health system within the supervision of the

9    Commissioner, that that last clause there has meaning.  It is

10   not any hospital; it has to be a hospital that's providing

11   services that are within the Commissioner's supervision.  And

12   the statute lays out a process for that, and the process that

13   it lays out is either you are a New Hampshire Hospital or you

14   become a designated receiving facility, and you have to consent

15   to do that, and if you do not become a designated receiving

16   facility, if you're not consenting to being part of the state

17   mental health services system, you are not part of it.

18        And so, I don't believe, your Honor, respectfully,

19   that that's a strained reading, but I do appreciate your point,

20   which is that, if the reading that you just proposed is the

21   correct reading, then the due process hearing would be

22   required, and I don't think we're disputing that.

23        THE COURT:  All right.  Did you have anything further?

24        MR. GARLAND:  I don't think so, your Honor.  And I

25   wasn't planning, unless you had questions, on touching upon the

1    other allegations of state action.  I mean, I do think that

2    your focus is the same as the focus I intended, and so, unless

3    you have other questions, that's all I have to say about that

4    now.

5                THE COURT:  Thank you.

6                MR. GARLAND:  Thank you.

7                THE COURT:  Mr. Curtis.

8                MR. CURTIS:  Yes.  Thank you, your Honor.  And just to

9    give you a little preface here, we would like to split our time

10   today between myself and Mr. McGrath.  I will address the

11   constitutional claims that we've alleged under Counts One and

12   Two of our complaint, and then Mr. McGrath will focus on Count

13   Three, which is our statutory claim under the IEA statute.  And

14   we would submit that the timing required under the statute is

15   really only directly applicable to that third count, because

16   we, as I'll explain in a moment, believe that our

17   constitutional claims should survive regardless of when a due

18   process hearing is required under the State IEA statute, your

19   Honor.

20              So, just to begin, I'd like to sort of build out that

21   point a little bit more and explain that we're taking the

22   position that the State is still violating the Constitution and

23   engaging in direct action in this case by doing a couple of

24   things, and the first is they're telling hospitals that they

25   need to detain patients and renew their IEA certificates every

1    three days and then, once they've done that, they're

2    withholding due process from those patients while they're held

3    in the emergency rooms.

4          And another key point I'd like to emphasize that's

5    related to that is that we have chosen to sue the State here,

6    not the hospitals, and so all of the cases and all of the

7    theories that the State has been trying to put forward about

8    how this case is just about the hospitals' actions are really

9    not all that pertinent here, because our claims are against the

10   State, and we're suing them for acting in a way that is

11   violating people's constitutional rights in connection with

12   involuntary emergency admission of those patients.

13         THE COURT:  When you say "state," you really mean the

14   Commissioner in her individual capacity?

15         MR. CURTIS:  In her official capacity, your Honor.

16         THE COURT:  In her official capacity.  All right.

17         MR. CURTIS:  Yes.

18         THE COURT:  I know all of us sort of go back and forth

19   between State Department and Commissioner.  She's the real

20   party here, correct, the correct party?

21         MR. CURTIS:  That is correct, yes.  And we think

22   Monell makes that clear, that you can sue a state official in

23   her official capacity as a representative of a department or a

24   governing organization within the government, and so we have

25   sued Commissioner --

1       THE COURT:  Let me just ask you about that _Monell_

2   comment a minute.  We won't dwell on it too long.

3       MR. CURTIS:  Okay.

4       THE COURT:  But as I understood -- you mention this in

5   your surreply, and, as I understand it, _Monell_ applies to 1983

6   claims brought against municipalities and other local

7   governmental units, and so I don't quite understand how you're

8   making that case applicable to the Commissioner in this case.

9       MR. CURTIS:  Yes, your Honor.  So, our understanding

10   is that governments and their officials, as the First Circuit

11   has explained and as a couple of other cases have applied, I

12   believe, to state governing bodies as well, that those

13   governing bodies and various departments can be sued pursuant

14   to _Monell_ when they have engaged in official policy or custom

15   or practice that is violating people's constitutional rights.

16       THE COURT:  All right.  I'll look at that further.

17       MR. CURTIS:  Yeah.  And we're happy, if it's helpful,

18   to submit additional information on that, your Honor, if that

19   would be helpful, given that we didn't have a ton of space to

20   go into a great deal of depth on that issue in our previous

21   briefing.

22       THE COURT:  Yes, why don't you do that.

23       MR. CURTIS:  Okay, we'll do that.  So, returning to

24   the issues at hand here, we have, as I said, alleged claims

25   against the State for their actions in response to what has

1    developed as sort of a bordering crisis in the State of New

2    Hampshire, and what we would submit is that, whatever the

3    Constitution requires, a person certainly can't be

4    involuntarily detained without due process for 27 days or 20

5    days or 15 days or even 5 days without some sort of safeguards

6    to ensure that they are receiving some protections and due

7    process to ensure that they are being detained properly.

8           The State has created the statutory scheme here which

9    has led hospitals to complete IEA certificates and hold

10   patients, and the State is then supposed to deliver patients to

11   DRFs and provide probable cause hearings.  But instead of doing

12   that, the State has chosen not to deliver patients to DRFs and

13   has chosen not to provide hearings, and, instead, the state is

14   telling the hospitals that they should detain these patients

15   and renew their IEA certificates every three days on this

16   theory that that somehow allows the hospitals to continue

17   holding people for indefinite periods of time while the State

18   is supposed to be taking action and is supposed to be providing

19   due process to those people.  Those directions from the State

20   are clearly state action, and I think my colleague, Mr.

21   Garland, acknowledged earlier that the state has told hospitals

22   that it's best practice to do that and to continue to renew

23   those IEA certificates every three days.

24           THE COURT:  So, you contend that, once the certificate

25   is issued, then the Commissioner has the responsibility of

1    seeing that a probable cause hearing is held within three days?

2          MR. CURTIS:  That is our position, your Honor, but

3    even if the hearing doesn't need to occur within three days, we

4    still submit that the Commissioner has an obligation to act at

5    that time.  It's supposed to either provide a due process

6    hearing within three days of that certificate being completed,

7    or it's supposed to transfer the person to a DRF and provide

8    the due process hearing there, and the Commissioner has chosen

9    just to not do any of those things and just sit on their hands

10   until beds become available in DRFs and deny people any kind of

11   due process in the interim.

12         THE COURT:  Do you know from the -- you may not know

13   this, but from the history of this -- of the application of

14   this statute going back years and years after it was first

15   enacted, do you know was this procedure followed on a regular

16   basis before the numbers became so great that these

17   difficulties arose?

18         MR. CURTIS:  Yes.  It's my understanding, your Honor,

19   and I believe we've alleged in our complaint that prior to the

20   recent five to ten years or -- I'm not sure exactly how long

21   it's been lasting that this crisis has been going on -- but my

22   understanding is that prior to that the State was immediately

23   transferring people from the emergency rooms to the DRFs or New

24   Hampshire Hospital where they were receiving due process

25   hearings within about three days of their IEA certificate being

1    completed.  So, that is, I believe, how the legislature thought

2    it would function and how they have always understood this

3    process as working, and I think there are pretty clear

4    indicators from the legislative history that suggests that that

5    is how they've always viewed the statute and how they thought

6    it would occur.  But, as you say, in recent years that process

7    has deteriorated as DRF beds have become fewer and further

8    between, and the problem has emerged that there isn't space to

9    transfer people, and so, as a result, the State has just chosen

10   not to transfer them at all and to simply deny any kind of due

11   process while they're waiting for a transfer to a DRF facility.

12          And, as I said, you know, all of the hospitals are

13   doing this, are engaged in this practice of renewing the IEA

14   certificates every three days.  It's pretty consistent across

15   the board, which is one reason that we believe that the State

16   has directed hospitals to do that; and, you know, we need

17   further discovery to further understand all of the dynamics of

18   what has been going on here and what kind of direction has been

19   occurring.

20          But at the 12(b)(6) stage we believe that our

21   allegations are sufficient here, that we've clearly alleged

22   that the State is telling these hospitals to do this and to

23   engage in this practice, and that in and of itself, regardless

24   of what the statute requires, is state action, and, therefore,

25   the idea that this is just about the hospitals' actions and

1     doesn't involve any action by the State is not accurate and not

2     correct here, your Honor.

3              THE COURT:  Are you aware of whether under New

4     Hampshire law a local hospital or its personnel are permitted

5     to refuse to examine or evaluate a person in a hospital

6     emergency room who is experiencing or appears to be

7     experiencing a mental health crisis?  Are you aware of any?

8              MR. CURTIS:  We are not aware of any provision that

9     would allow them to refuse care, and we didn't really focus on

10    this issue in our briefs, but I believe that the intervenor

11    hospitals have emphasized that there is this provision

12    151:2(g), which, exactly to the contrary, tells them that they

13    need to accept patients who come into their emergency rooms for

14    care and that they are required to provide emergency services.

15    So, we would agree with the hospitals that they are required to

16    act in these circumstances and that they are required to take

17    these patients in, and that just sort of plays into the State

18    statutory scheme where they've created a system whereby the

19    hospitals are actually the beginning of the process, and that's

20    what their -- DHHS's website says.  It says that hospitals are

21    where patients should go and where law enforcement should take

22    people when they believe that they are a threat to themselves

23    or others, and that is exactly what's happening.

24              So, the State is directing people to go to the

25    emergency rooms where that process will begin, and then the

1    hospital completes the IEA certificate, and they exercise their

2    professional judgment in doing that, but if they believe that

3    this person is a threat to themselves or others, the statute

4    clearly suggests that they should complete the IEA certificate

5    and begin the process of having this person be involuntarily

6    detained, and that's what's happening here.

7         And so, we think that both the statutory scheme and

8    the directions that have been given by the State, by DHHS

9    themselves, are leading to these patients being involuntarily

10   detained in hospitals and in emergency rooms while they're

11   waiting to be transferred to DRFs, and that the State has an on

12   obligation to provide due process to them.

13        I mean, in one of the sort of seminal cases that

14   Estades-Negroni, Rockwell and Trimble all rely on, Spencer,

15   Judge Posner himself actually noted that this was an issue and

16   a very similar situation.  In Spencer the Court ended up

17   holding that the hospital's actions were not attributable to

18   the State, but even there Judge Posner noted that it would be,

19   quote, monstrous for states to allow family members, physicians

20   and other private persons, I think he was referring to, or

21   suggesting hospitals there, to exercise their commitment powers

22   without some sort of safeguards, including a due process

23   hearing in a timely manner.  And so, I don't think there's

24   really any question here that there is a liberty interest at

25   stake here, and Rockwell and Estades-Negroni all acknowledge

1     that.

2            But for some reason the State thinks that, even though

3     there is a liberty interest here, they don't need to act

4     because they have been relying on private hospitals to act as

5     involuntary detention centers while they wait to transfer these

6     people to DRF facilities -- DRFs.  And as I mentioned a little

7     earlier, we would suggest that that is a policy and practice of

8     withholding due process from people for indefinite periods of

9     time and depriving them of their counsel during that time, and

10    we think that that constitutes a viable Section 1983 claim, and

11    that those acts and omissions are clearly direct action by the

12    State, which is really the only defense that the state has

13    raised here or that DHHS has raised here.  They have argued

14    that they are not acting and not doing anything, and so,

15    therefore, we don't have a viable 1983 claim.

16           And just to sort of emphasize the point as well about

17    how we have -- we've sued the State, not the hospitals, and, as

18    I mentioned before, all of the cases that DHHS has cited here

19    were cases against hospitals, and ours is about the State's

20    actions or DHHS's actions as opposed to the hospitals' actions.

21    And to that point we also think that the cases that they've

22    relied on are distinguishable on the facts, because the State

23    here or DHHS here is deeply involved in every step of the

24    process.  They have directed hospitals to detain patients and

25    renew their IEA certificates every three days.

1        As I mentioned before, the process begins in the ERs.

2   Their website says that, and the statute also suggests that.

3   It instructs physicians and APRNs to carry out the mental

4   health examinations and complete these certificates, and the

5   State prepares and publishes the forms that are used in the

6   process.  The statute says that when law enforcement takes a

7   person believed to be suffering from a mental illness into

8   protective custody, law enforcement should transport that

9   person directly to an emergency room of a licensed general

10  hospital.  So, it's clearly telling law enforcement to continue

11  engaging in this process of taking people to emergency rooms

12  and beginning the process there.  A justice of the peace can

13  order a law enforcement officer to take someone into custody

14  and deliver them to an emergency room, where they'll oversee

15  the compulsory mental health examination.  And, as I mentioned

16  before, by refusing to transfer patients out of the emergency

17  rooms we think that the State or DHHS is effectively treating

18  these hospital emergency rooms as involuntary detention

19  centers.

20       So, for all of those reasons we think that our federal

21  and state constitutional claims should survive, regardless of

22  what timing is required under the statute and regardless of

23  whether that three days is triggered from the IEA certificate

24  or from the transfer to the DRF.

25       But unless you have any further questions about that,

1    I'd like to reserve a little bit of time for Mr. McGrath to

2    talk more about that timing, because I think that is fairly

3    critical to our state statutory claims and is important to, you

4    know, maintain those claims in this case as well.

5            THE COURT:  Certainly.

6            Mr. McGrath.

7            MR. McGRATH:  Good morning, your Honor.  It's clear to

8    us that the purpose of C:31 of the statute is to protect a

9    person's liberty interests.  The legislature recognized that

10   when a person is held involuntarily for purposes of involuntary

11   emergency admission, that that is a serious curtailment of

12   their liberty, and that cannot be effectuated by the State

13   without some amount of due process.  The State made it clear in

14   C:31 that a hearing must be provided within three days of when

15   an involuntary emergency admission occurs.  It's entirely

16   unreasonable to interpret the statute to suggest that an

17   involuntary emergency admission does not occur upon completion

18   of an IEA certificate.  When the certificate is completed the

19   person is not free to leave.  That's how the legislature

20   understood this statute to operate, and for that reason it's

21   critical that the hearing be provided within three days of when

22   the certificate issues.  This means that the term "involuntary

23   emergency admission" has to be interpreted to mean an admission

24   upon the completion of the IEA certificate.

25            Now, the State has sort of dug into the weeds of

1    various provisions of the statute and looked for hints in the

2    text to suggest that perhaps an admission doesn't happen until

3    a person is transferred to the DRF, but that's, as your Honor

4    observed, a somewhat strained way of reading the statute.  And

5    so, I think it would be helpful to just sort of focus on a

6    couple of the points that have been raised that are these sort

7    of suggestive hints at why a transfer doesn't happen until or

8    admission doesn't happen until there's been a transfer to the

9    DRF.

10           One of the first -- or one of the points that the

11   State relies on is the period of time that is hinted at in

12   C:29-A, and C:29-A is not a provision about the due process

13   hearing that's required under the statute.  This is about how

14   the State contemplates the, you know, basically this brief gap

15   in time between when the certificate is issued and when a

16   person is taken into custody.  All that statute, that that

17   provision contemplates is that a police officer, a law

18   enforcement officer wasn't in the hospital emergency room at

19   the time that the certificate was issued and contemplates the

20   possibility that before the law enforcement officer appears

21   that the need for an admission or transfer to a DRF is no

22   longer present, and so it obviates the need to unnecessarily

23   transfer a person to a DRF if the issues that gave rise to the

24   need for involuntary admission have subsided.

25           The State also points to the language in C:28, where

1   the statute references involuntary emergency admission shall be

2   to the state mental health services system.  Nowhere does the

3   statute define the term "state health services system."  The

4   state points to C:23 and C:26 and says that somehow those

5   provisions mean that the state mental health services system

6   only encompasses designated receiving facilities and New

7   Hampshire Hospital.  But that's not what this provision's

8   saying.  C:23 merely defines the term designated -- or it only

9   -- it doesn't even -- you know, nowhere does it include a

10  definition for state mental health services system, and it only

11  says that the system shall be established, and then C:26 merely

12  states that the Commissioner may designate a facility as a

13  designated receiving facility.  There's no language there that

14  narrows the scope of what the state mental health services

15  system is.

16          Next, the State suggests that our interpretation of

17  the immediate transfer provision in C:29 is incorrect.  Now,

18  C:29 reads that, Upon completion of an involuntary emergency

19  admission certificate a law enforcement officer shall take

20  custody of a person to be admitted and shall immediately

21  deliver such person to a receiving facility.  That language

22  does not contemplate any gap in time between when the

23  certificate is issued and when the transfer occurs.  The fact

24  that the word "immediately" modifies the word "shall deliver"

25  or the phrase "shall deliver" does not mean that the person is

1    not required to be immediately taken into custody.  The word

2    "upon" used at the very beginning of that sentence means

3    immediately following or at the occurrence of, and so the

4    language upon completion of the IEA certificate the law

5    enforcement officer shall take custody of the person means that

6    when the certificate issues there is no gap in time -- no

7    significant gap in time and certainly not several days

8    contemplated by the IEA statute.  The admission happens

9    immediately.  The person is not free to leave because, as the

10   legislature drafted this, the lawmakers contemplated that a

11   person is taken into custody right as the certificate is

12   issued.

13          THE COURT:  Now, I suppose what that's intended to do

14   is to make it clear that, when the officer comes to the

15   emergency room and takes custody of this person, that the

16   person is to be immediately delivered to the facility and not

17   be taken down to the police station or somewhere else.  This is

18   a transfer from the emergency room to the designated facility.

19          MR. McGRATH:  Precisely.

20          THE COURT:  And that's all that's supposed to be done

21   here.

22          MR. McGRATH:  That's correct.  But it also suggests

23   that the person is taken into custody immediately when the

24   certificate is issued.

25          THE COURT:  That's right.

1          MR. McGRATH:  And what this suggests is the

2     legislature understood that, when a certificate is issued, a

3     person is no longer at liberty, and what C:31 is concerned with

4     is ensuring that there's a due process hearing provided within

5     three days of when a person is no longer free to leave.  The

6     person's liberty has been curtailed, and it is critical that a

7     hearing is provided within three days of when that occurs.

8     When the legislature drafted this statute this sort of

9     indefinite period of time in which a person is held in a

10    hospital emergency room against their will was not something

11    that the law makers contemplated, and so, what is happening is

12    there's sort of this artificial scenario where people are being

13    deprived of their statutory rights simply because the lawmakers

14    did not expressly make clear that if you're in a hospital

15    emergency room that right is triggered by the statute as well.

16    But it's clear that the statute really isn't concerned with

17    where you're at.  You could be in a hospital emergency room,

18    you could be in a DRF, but if you're not free to leave and

19    you're being held pursuant to a certificate that statutory

20    right has been triggered.

21          THE COURT:  My earlier question asked that.  Why does

22    it make a difference where the person is if the person is in

23    custody?

24          MR. McGRATH:  Precisely.

25          THE COURT:  That's the operative status here, is

1    custody, loss of freedom.

2         MR. McGRATH:  That's exactly right, and we believe

3    that that is what animates the statute and requires the

4    hearing.

5         One other point to note, and it's a minor one, but the

6    State has emphasized a couple of times that the phrase "person

7    to be admitted" is used in a prospective way, and so it

8    suggests that when the certificate issues the person is only

9    later going to be admitted, but the statute really, it can't be

10   read that way.  The term "person to be admitted" is sort of a

11   term of art that's used throughout the statute to describe the

12   person who is being brought into the involuntary emergency

13   admissions process.  And because it's used this way the statute

14   actually uses the term "person admitted" in that same context

15   where it actually contemplates that the person has already been

16   brought to the designated receiving facility.

17        So, Section C:31, Paragraph II, for example, this is

18   discussing the rights and responsibilities -- the emergency

19   admission hearing process, and, for example, Part II says the

20   person sought to be admitted or the petitioner may request a

21   continuance of the probable cause hearing.  Well, if the

22   probable cause hearing is being requested to be continued,

23   clearly the right to the hearing already exists, and so if the

24   person to be admitted is asking for a continuance of a hearing

25   and they already have that right, it's just unreasonable to

1    suggest that, well, if the term "person to be admitted" appears

2    elsewhere in the statute it only means that the person has not

3    yet been admitted.  Clearly, the person has already been

4    admitted in C:31, Part II, and yet that term is being used.  It

5    shows that as a term of art.  It's so that the legislature is

6    identifying the individual who is being brought into the

7    services system, and they are consistent throughout the statute

8    in that usage.  So, to suggest that that means or somehow

9    indicates that the legislature anticipates that admission does

10   not happen until transfer to a DRF is just plainly wrong.

11          I'll just review my notes to see if there's anything

12   left to say, but I think that really covers what I wanted to

13   address.

14          We would just add that the statute is clear, and so to

15   the extent -- there really is no -- there is no need to sort of

16   dig into the legislative history, because it is abundantly

17   apparent from the language of the statute that the hearing

18   right is triggered upon the IEA certificate, but the

19   legislative history also reinforces our position.  The

20   legislature is clear, was clear, the lawmakers were clear when

21   particularly, for example, in 1997, when the legislature was

22   expanding the categories for possible admission, that the

23   hearing is critical to protecting individuals' rights, and if a

24   person is no longer at liberty, a hearing is required within

25   three days.  This is something that was emphasized, something

1    that made the expanded categories of admission tolerable to the

2    State legislature.

3          And, as a final note, if the State's interpretation

4    were to prevail, it would really render this statute

5    unconstitutional.  It would be contemplating a depravation of

6    liberty without due process within a reasonable period of time

7    when a person is brought into custody pursuant to the State

8    authority.  And so, we would submit that, to the extent the

9    Court finds any ambiguity in any of the statutory language

10   here, which we think there is not, those provisions should be

11   construed in a way that avoids any sort of constitutional

12   violation to avoid a constitutional conflict here.  And with

13   that, I'll end my remarks.

14         THE COURT:  In terms of legislative history, it was in

15   2017, wasn't it, that the legislature established a commission

16   to try to address this issue?  Was it 2017?

17         MR. McGRATH:  I believe that's right.  If not, it was

18   2018.  I think it was 2017, yeah.

19         THE COURT:  All right.  Thank you very much,

20   Mr. McGrath.

21         MR. McGRATH:  Thank you, your Honor.

22         THE COURT:  Mr. Ramsdell.

23         MR. RAMSDELL:  Thank you, your Honor.  First, I'll say

24   that we agree with the statutory interpretation offered by the

25   plaintiffs in this case, and I won't reiterate how we interpret

1    the statutes differently than the State has offered to you,

2    because I think that plaintiffs have done a very good job

3    explaining that.  Instead, I'll be brief, but I'm just going to

4    try and fill in a couple of blanks about how state action

5    actually pervades the involuntary emergency admission process.

6    As mentioned earlier, although I don't think quite

7    specifically, it really starts with it is the Commissioner of

8    DHHS whose responsibility it is to maintain a list of qualified

9    medical professionals who may order an IEA certificate.  As the

10   Court noted in its questions to the State, DHHS literally sends

11   people to hospital EDs, not to New Hampshire Hospital or not to

12   a DRF but to hospital EDs to commence the IEA process, and

13   there it's not a purely voluntary act on -- it is medical

14   judgment goes into whether the IEA certificate is warranted,

15   but neither the hospital nor the physician has a purely

16   voluntary choice whether to examine someone for whether an IEA

17   certificate is warranted.  Hospitals, unlike the New Hampshire

18   Hospital, are required to operate emergency departments and

19   provide emergency services 24 hours a day, and that's by state

20   statute, RSA 151:2-g.  It's actually a condition of the

21   hospital's license.  So, they couldn't possibly turn the person

22   away.

23          Then you have to look at the administrative code

24   regarding the physicians also.  As we pointed out in our

25   surreply, part of the administrative code requirements is that

1    physicians follow the American Medical Association Code of

2    Ethics.  That Code of Ethics makes it -- the physician's

3    responsibility to the patient is his paramount concern, and so

4    the physician could not possibly examine someone, find that

5    they were a danger to himself or herself or to others, and then

6    not complete the IEA certificate.  That's what the system is

7    designed for.  That's what the physician is obligated to do

8    both by state statute and by the administrative code.  And so,

9    the screening process itself involves state action, and it

10   doesn't -- once the certificate is signed, the State action is

11   even more obvious and continues.

12          As the Court has pointed out, the patient is admitted

13   to the state mental health system by statute.  The patient is

14   to be transported from the hospital ED to a DRF immediately,

15   but DHHS completely controls whether the patient actually is

16   transported to a DRF or to New Hampshire Hospital, and while

17   that patient remains at a hospital ED the hospital staff, the

18   physician, is required every three days to complete a new

19   medical evaluation.  And there seems to be some confusion here

20   between the State's allegations or response in its memo of law

21   and what we may have heard this morning.  The State suggested

22   in its pleadings that that statement, that allegation the Court

23   should not accept as true because we offered that that's from

24   the DHHS website, when, in fact, it doesn't appear there.  I

25   direct the Court to paragraph 40 of our amended complaint.  We

1    do not allege that that statement appears on the DHHS website

2    at all.  It is a specific allegation of fact, and I will advise

3    the Court it is based on information received directly from

4    DHHS by the hospitals.

5          As was suggested this morning, the DHHS provides

6    training to New Hampshire Hospitals, and I can tell you that

7    that allegation and statement comes directly from a New

8    Hampshire Hospital admissions training presentation that was

9    put together and offered not long before this lawsuit was

10   filed, and under the heading of IEA best practices a/k/a dos,

11   it states, and I quote, Make sure pages 5, 6, and 7 are

12   re-executed every three days for patients holding in the ER at

13   chronological numbers to the added pages 8, 9, 10, 11, 12, 13,

14   et cetera.  That comes directly from the training manual.  And

15   the purpose for that is, your Honor, both the statute, RSA

16   135-C:28,I and the IEA certificate itself require that an

17   examination is performed within three days of the date of the

18   petition being filed to the Court.  And so, by directing the

19   hospitals to have their physicians perform the evaluation every

20   three days, New Hampshire Hospital or the DRF doesn't have to

21   perform another evaluation in order to file the petition with

22   the Circuit Court, it's already been done by the hospital at

23   the direction of New Hampshire Hospital.

24         We've, I believe, set forth our arguments in our

25   pleadings.  I also think that the statutes have already been

1  explained to you in a very similar manner to the way we would

2  by plaintiffs, and so if the Court has any questions I'll be

3  happy to try and respond to those, but otherwise I don't know

4  what else I would offer the Court that wouldn't be somewhat

5  redundant.

6          THE COURT:  The Commissioner in her memo says if the

7  private hospital does not want to hold the patient it does not

8  need to complete an IEA petition or certificate in the first

9  instance.  That seems to fly in the face of statutes and

10  ethics, does it not?

11          MR. RAMSDELL:  It is simply wrong for the reasons I

12  said, both RSA 151:2-g and the administrative code as well as

13  the American Medical Association Code of Ethics.  It is simply

14  not -- it could not be -- it's also a matter of common sense,

15  if we're going to be real candid about it, that a physician

16  can't look at someone who has arrived at a hospital emergency

17  room and say, You know what?  You seem to be a danger to

18  yourself or to someone else.  Have a nice day.  You're correct,

19  your Honor.

20          THE COURT:  Now, healthcare providers are provided

21  with certain immunity, as we know, in Section 329-B of our

22  statute, psychologists, physicians and surgeons, mental health

23  practice, alcohol and drug use professionals, and those

24  provisions are all the same.  And essentially they say, Any

25  person licensed under this chapter has a duty to warn of or

1   take reasonable precautions to provide protection from a client

2   or patient's violent behavior when the client or patient has

3   communicated to such licensee a serious threat of physical

4   violence against a clearly identified or reasonably

5   identifiable victim or victims or a serious threat of

6   substantial damage to real property.

7          And then it says, The duty to warn may be discharged,

8   and no monetary liability shall arise in certain circumstances

9   if the licensee makes reasonable efforts to communicate the

10  threat to the victim or victims, notifies the Police Department

11  closest to the client's patients or potential victim's

12  residence, or obtains civil commitment of the client or patient

13  to the state mental health system.

14         So, when a doctor or healthcare professional makes the

15  determination that an IEA must issue, they are really following

16  this other statute also --

17         MR. RAMSDELL:  That would be correct, your Honor.

18         THE COURT:  -- in the best interests of the patient

19  and of the public.

20         MR. RAMSDELL:  That is correct.

21         THE COURT:  All right.  Thank you, Mr. Ramsdell.

22         MR. RAMSDELL:  Thank you, your Honor.

23         THE COURT:  Mr. Garland, would you like a brief

24  rebuttal?

25         MR. GARLAND:  Very brief, your Honor.  So, with

1    respect to kind of the line of questions that you asked and the

2    argument as to whether a hospital is obligated to hold somebody

3    who presents with mental health symptoms, we have not disputed

4    and we're not suggesting that a hospital may not be under an

5    obligation to hold somebody.  The question is whether they are

6    in state custody for the purposes of 135-C, and we believe that

7    the plain language and structure of that statute do not put a

8    person within state custody in that this is still a voluntary

9    and discretionary decision.  And I do believe that the indirect

10   state action cases that we've cited fully support that.  What

11   the hospitals are not saying and what they're not explaining is

12   why, if a doctor is under some obligation to invoke this

13   statute, and we don't think that the statutory language

14   requires that, and their failure to do so would somehow -- or,

15   rather, that their action is compelled by this statute, and we

16   don't think it is -- how they are not also a state actor under

17   one of the indirect theories.  And the reason for that is

18   because the First Circuit has repeatedly recognized and Judge

19   McAuliffe repeatedly recognized that these are voluntary

20   actions, that there is some amount of discretion and

21   voluntariness to this, and RSA 135-C embraces that.  It is not

22   the only way a hospital can address the situation, and it does

23   not impose any requirement.  It may impose best practices, it

24   may impose an avenue through which a hospital, based on its

25   economic or its concerns about litigation or its prudential

1    concerns or its EMTALA law obligations or its common-law

2    duties, may say this is the path of least resistance or this is

3    even the appropriate path, but the statute does not say this is

4    the only path, this is the required path, You have to do this,

5    Hospital.

6           And I think that's the point we're trying to make, is

7    that that sort of voluntariness, it may not be voluntary in the

8    most abstract sense, because it may not mean that a hospital

9    can make any choice that it wants to and simply release

10   somebody, but the statute does not require that they go through

11   this particular process.  And so, I just wanted to clarify that

12   point.

13          And then the two other very brief points, briefer than

14   that, and this obviously is not -- this is something that we

15   are all aware of, but when interpreting the statute we have to

16   start with the text and the structure, and we believe that most

17   of the arguments that you're hearing today are arguments as to

18   what the plaintiffs and what the hospitals wish the statute

19   did.  They wish the statute, because there is clearly, it is

20   not operating at maximum efficiency, they wish this statute had

21   certain requirements.  We do not believe it does, and they have

22   not challenged the statute itself, and I think that's an

23   important distinction.  They're not saying the way the statute

24   is operating violates the Constitution.  They're saying this

25   statute imposes certain requirements on the State and the State

1    is not filling those, and we simply don't think it does.

2          And then the third point, and it's a related point I'd

3    make with respect to that, is that we obviously believe that

4    the statute is unambiguous as well, and the plaintiffs have

5    made an argument and the hospitals have made an argument that

6    it's unambiguous in the other direction.  If your Honor thinks

7    there's some ambiguity, or if there is some question as to how

8    a particular provision operates, the answer isn't for you, I

9    don't believe, respectfully, your Honor, to invoke the doctrine

10   of constitutional avoidance.  I think the answer is to send

11   that question to the New Hampshire Supreme Court.  Judge

12   Laplante recently did this in the Caroline Casey voting case,

13   and he recognized that the New Hampshire Supreme Court has all

14   of the tools that the Federal Court has, but also the Court has

15   jurisdiction within the State, and so we don't think that's

16   necessary, and I'm certainly not advocating for that.  We

17   believe our reading is correct, we believe our reading is

18   unambiguous that is based on unambiguous text and structure,

19   but the answer isn't for you, your Honor, to read a statute if

20   it is ambiguous in a way that avoids the constitutional

21   question.  It would be to ask the Supreme Court to resolve any

22   sort of ambiguities.

23          THE COURT:  Have you discussed this with other

24   counsel, about the possibility of certifying questions?

25          MR. GARLAND:  In terms of opposing counsel, your

1    Honor?

2         THE COURT:  Yes.

3         MR. GARLAND:  We haven't discussed it.  I recall,

4    though it was probably last fall when we had a conference with

5    you, that you did raise the prospect, and we are not advocating

6    for it.  I want to make that abundantly clear.  We don't think

7    it's necessary.  We think the statute is unambiguous, but we do

8    think that, to the extent there is an ambiguity, it's something

9    that would be best for the Supreme Court to resolve.

10        THE COURT:  Well, will counsel please discuss that

11   together, the possibility of certification to the New Hampshire

12   Supreme Court, and then what we will do is schedule a

13   teleconference in the next week or two to discuss that.  But

14   I'd like counsel to discuss it among themselves, first of all.

15        MR. CURTIS:  Your Honor, if I may?

16        THE COURT:  Yes.

17        MR. CURTIS:  If I may, your Honor, we're happy to

18   speak with defense counsel about that and get back to you on

19   our position after we've had that conversation, but I would

20   just note that the plaintiffs also do not advocate for

21   certification to the State Supreme Court, and we think that, as

22   I mentioned before, even certifying the question to the State

23   Supreme Court wouldn't actually resolve all of the issues here,

24   because if the statute is not being -- if we have not

25   interpreted the statute correctly, and if the State is right in

1    their interpretation of the statute, we would submit that there

2    is still a requirement that the State provide timely due

3    process when people are being involuntarily detained, and so

4    just saying that they need to do that within three days of

5    transferring someone to a DRF under the statute doesn't solve

6    that constitutional problem and doesn't solve the problem of

7    the policy and practice of withholding due process indefinitely

8    while people are being detained.

9           But, as I said, we're happy to go back and discuss

10   amongst ourselves and get back to you on whether certification

11   to the State Supreme Court would be an appropriate approach

12   with respect to the statutory issues here, but we do think the

13   case should go forward on the constitutional claims regardless

14   of whether that question is certified.

15          THE COURT:  The statute is set up to have a case run

16   smoothly.  A patient comes in, a patient is evaluated, a

17   certificate issues, that in three days -- the patient is then

18   sent to a designated facility.  Within three days the hearing

19   is held, and constitutional rights are preserved, the patient

20   is getting the treatment that that patient needs.  That's

21   another unfortunate consequence of the present procedure, is

22   that these patients who are having a mental health crisis are

23   not receiving the treatment that they need in the hospital

24   emergency rooms while they're being held, and that is very,

25   very unfortunate.  This statute is set up so that it's meant to

1    operate smoothly and taking into account treatment needs,

2    constitutional rights and what have you, and the fact that

3    numbers have increased that have resulted in a different

4    approach and with these different interpretations of the

5    statute now in order to try to make it fit into the existing

6    situation, that creates some serious problems.

7            Well, thank you very much, everybody.

8            MR. CURTIS:  Thank you, your Honor.

9            THE COURT:  I think this has gone relatively smoothly.

10   I miss being in person with all of you, but this is the way

11   things are for now.  I thank you very much, and I hope you all

12   remain well.

13           MR. RAMSDELL:  Thank you, your Honor.  Same to you.

14           MR. GARLAND:  Thank you, your Honor.  Likewise.

15           MR. CURTIS:  Thank you.

16           MR. GARLAND:  Your Honor, very briefly and, I'm sorry,

17   because that was a very nice sendoff, I assume, by virtue of

18   that, that you're not looking for any additional argument with

19   respect to the takings claim or the Fourth Amendment claim, and

20   we're ready to rest on our pleadings with respect to that.  We

21   do think state action is the major issue.  We think those are

22   alternative grounds to dismiss the hospital's complaint.  So, I

23   won't belabor that, but I just wanted to make sure you had no

24   questions on that.

25           THE COURT:  No, I don't.

1          MR. GARLAND:  Thank you very much, your Honor.

2          THE COURT:  Thank you all.

3          MR. RAMSDELL:  Thank you, your Honor.

4          MR. CURTIS:  Thank you, your Honor.

5          MR. McGRATH:  Thank you, your Honor.

6     (WHEREUPON, the proceedings adjourned at 11:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *Doe, et al., v. NHDHHS,*

9    *et al*, No. 18-cv-1039-JD

10

11

12

13

14   Date: ___10/21/20          /s/ *Brenda K. Hancock*
                                 Brenda K. Hancock, RMR, CRR
15                               Official Court Reporter

16

17

18

19

20

21

22

23

24

25